# BUCKLEY *v.* FITZSIMMONS ET AL.

No. 91-7849.   Argued February 22, 1993—Decided June 24, 1993

STEVENS, J., delivered the opinion for a unanimous Court with respect to Parts I, II, III, and IV–B, and the opinion of the Court with respect to Parts IV–A and V, in which BLACKMUN, O'CONNOR, SCALIA, and THOMAS, JJ., joined. SCALIA, J., filed a concurring opinion, *post*, p. 279. KENNEDY, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, C. J., and WHITE and SOUTER, JJ., joined, *post*, p. 282.

*G. Flint Taylor* argued the cause for petitioner. With him on the briefs was *John L. Stainthorp.*

*James G. Sotos* argued the cause and filed a brief for respondents.

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief

were *Solicitor General Starr, Assistant Attorney General Gerson,* and *Deputy Solicitor General Mahoney.**

JUSTICE STEVENS delivered the opinion of the Court.

In an action brought under 42 U. S. C. § 1983, petitioner seeks damages from respondent prosecutors for allegedly fabricating evidence during the preliminary investigation of a crime and making false statements at a press conference announcing the return of an indictment. The questions presented are whether respondents are absolutely immune from liability on either or both of these claims.

As the case comes to us, we have no occasion to consider whether some or all of respondents' conduct may be protected by qualified immunity. Moreover, we make two important assumptions about the case: first, that petitioner's allegations are entirely true; and, second, that they allege constitutional violations for which § 1983 provides a remedy. Our statement of facts is therefore derived entirely from petitioner's complaint and is limited to matters relevant to respondents' claim to absolute immunity.

I

Petitioner commenced this action on March 4, 1988, following his release from jail in Du Page County, Illinois. He had been incarcerated there for three years on charges growing out of the highly publicized murder of Jeanine Nicarico, an 11-year-old child, on February 25, 1983. The complaint named 17 defendants, including Du Page County, its sheriff and seven of his assistants, two expert witnesses and the estate of a third, and the five respondents.

Respondent Fitzsimmons was the duly elected Du Page County State's Attorney from the time of the Nicarico

---

*Michael D. Bradbury* filed a brief for the Appellate Committee of the California District Attorneys Association as *amicus curiae.*

murder through December 1984, when he was succeeded by respondent Ryan, who had defeated him in a Republican primary election on March 21, 1984. Respondent Knight was an assistant state's attorney under Fitzsimmons and served as a special prosecutor in the Nicarico case under Ryan. Respondents Kilander (who came into office with Ryan) and King were assistant prosecutors, also assigned to the case.

The theory of petitioner's case is that in order to obtain an indictment in a case that had engendered "extensive publicity" and "intense emotions in the community," the prosecutors fabricated false evidence, and that in order to gain votes, Fitzsimmons made false statements about petitioner in a press conference announcing his arrest and indictment 12 days before the primary election. Petitioner claims that respondents' misconduct created a "highly prejudicial and inflamed atmosphere" that seriously impaired the fairness of the judicial proceedings against an innocent man and caused him to suffer a serious loss of freedom, mental anguish, and humiliation.

The fabricated evidence related to a bootprint on the door of the Nicarico home apparently left by the killer when he kicked in the door. After three separate studies by experts from the Du Page County Crime Lab, the Illinois Department of Law Enforcement, and the Kansas Bureau of Identification, all of whom were unable to make a reliable connection between the print and a pair of boots that petitioner had voluntarily supplied, respondents obtained a "positive identification" from one Louise Robbins, an anthropologist in North Carolina who was allegedly well known for her willingness to fabricate unreliable expert testimony. Her opinion was obtained during the early stages of the investigation, which was being conducted under the joint supervision and direction of the sheriff and respondent Fitzsimmons, whose

police officers and assistant prosecutors were performing essentially the same investigatory functions.[1]

Thereafter, having failed to obtain sufficient evidence to support petitioner's (or anyone else's) arrest, respondents convened a special grand jury for the sole purpose of investi-

---

[1] The relevant period and prosecutorial functions are described in petitioner's first amended complaint:

"28) Defendant Knight, and various others [sic] Defendants, including Doria, Fitzsimmons, and Burandt, apparently not satisfied with Defendant German's conclusions, contacted anthropologist Louise Robbins and Defendant Olsen of the Kansas Bureau of Indentification [sic] Crime Lab in search of a positive boot identification.

.        .        .        .        .

"31) Confronted with three different expert reports which failed to match Plaintiff's boot with the footprint on the door, the Defendants, including Knight, Burandt, and German, procured their 'positive identification' from Louise Robbins, whose theories and reputation in the forensic community were generally discredited and viewed with great skepticism, a fact these Defendants knew or should have known.

"32) Defendants Knight and King were involved with the Sheriff's police in all the early stages of their investigation, including the interrogation of witnesses and potential suspects. Specifically, Sheriff's detectives, including defendants Wilkosz and Kurzawa, at the direction and under the supervision, and sometimes in the presence and with the assistance of Defendants Knight, King, Soucek and Lepic, repeatedly interrogated alleged suspects, including Plaintiff Buckley and Alex Hernandez, who were not represented by counsel. Despite intense pressure and intimidation, Plaintiff Buckley steadfastly maintained his innocence and demonstrated no knowledge of the crime, while Hernandez told such wild and palpably false stories that his mental instability was obvious to the Defendants.

"33) As a result of these interrogations, at least one experienced Sheriff's detective who participated[,] concluded that Buckley and Hernandez were not involved in the Nicarico crime. This conclusion was buttressed by his general knowledge of the bootprint 'evidence.'

"34) He repeatedly communicated his conclusion, and its basis, to the Defendants named herein, including Defendants Doria, Knight, King, Soucek, Lepic, and Wilkosz.

"35) Unable to solve the case, Defendants Doria, Fitzsimmons, Knight and King convened a special Du Page County 'investigative' grand jury, devoted solely to investigating the Nicarico case." App. 8–10.

gating the Nicarico case. After an 8-month investigation, during which the grand jury heard the testimony of over 100 witnesses, including the bootprint experts, it was still unable to return an indictment. On January 27, 1984, respondent Fitzsimmons admitted in a public statement that there was insufficient evidence to indict anyone for the rape and murder of Jeanine Nicarico. Although no additional evidence was obtained in the interim, the indictment was returned in March, when Fitzsimmons held the defamatory press conference so shortly before the primary election. Petitioner was then arrested, and because he was unable to meet the bond (set at $3 million), he was held in jail.

Petitioner's trial began 10 months later, in January 1985. The principal evidence against him was provided by Robbins, the North Carolina anthropologist. Because the jury was unable to reach a verdict on the charges against petitioner, the trial judge declared a mistrial. Petitioner remained in prison for two more years, during which a third party confessed to the crime and the prosecutors prepared for petitioner's retrial. After Robbins died, however, all charges against him were dropped. He was released, and filed this action.

## II

We are not concerned with petitioner's actions against the police officers (who have asserted the defense of qualified immunity), against the expert witnesses (whose trial testimony was granted absolute immunity by the District Court, App. 53–57), and against Du Page County (whose motion to dismiss on other grounds was granted in part, *id.*, at 57–61). At issue here is only the action against the prosecutors, who moved to dismiss based on their claim to absolute immunity. The District Court held that respondents were entitled to absolute immunity for all claims except the claim against Fitzsimmons based on his press conference. *Id.*, at 53. With respect to the claim based on the alleged fabrication of evidence, the District Court framed the question as whether

the effort "to obtain definitive boot evidence linking [petitioner to the crime] was in the nature of acquisition of evidence or in the nature of evaluation of evidence for the purpose of initiating the criminal process." *Id.*, at 45. The Court concluded that it "appears" that it was more evaluative than acquisitive.

Both petitioner and Fitzsimmons appealed, and a divided panel of the Court of Appeals for the Seventh Circuit ruled that the prosecutors had absolute immunity on both claims. *Buckley* v. *Fitzsimmons,* 919 F. 2d 1230 (1990). In the Court of Appeals' view, "damages remedies are unnecessary," *id.*, at 1240, when "[c]ourts can curtail the costs of prosecutorial blunders . . . by cutting short the prosecution or mitigating its effects," *id.*, at 1241. Thus, when "out-of-court acts cause injury only to the extent a case proceeds" in court, *id.*, at 1242, the prosecutor is entitled to absolute immunity and "the defendant must look to the court in which the case pends to protect his interests," *id.*, at 1241. By contrast, if "a constitutional wrong is complete before the case begins," the prosecutor is entitled only to qualified immunity. *Id.*, at 1241–1242. Applying this unprecedented theory to petitioner's allegations, the Court of Appeals concluded that neither the press conference nor the fabricated evidence caused any constitutional injury independent of the indictment and trial. *Id.*, at 1243, 1244.[2]

---

[2] With respect to an issue not before us, petitioner's claims that he was subject to coercive interrogations by some of the respondent prosecutors, the court found that the extent of immunity depended on the nature of those claims. The court reasoned that, because claims based on *Miranda* v. *Arizona,* 384 U. S. 436 (1966), and the Self-Incrimination Clause of the Fifth Amendment depend on what happens at trial, prosecutors are entitled to absolute immunity for those claims; by contrast, only qualified immunity is available against petitioner's claims as to "coercive tactics that are independently wrongful." 919 F. 2d, at 1244. Because it could not characterize the nature of those claims, the court remanded for further proceedings concerning Fitzsimmons, King, and Knight on this issue. *Id.*, at 1245.

Judge Fairchild dissented in part. He agreed with the District Court that Fitzsimmons was entitled only to qualified immunity for his press statements. He noted that the majority had failed to examine the particular function that Fitzsimmons was performing, and concluded that conducting a press conference was not among "the functions that entitle judges and prosecutors in the judicial branch to absolute immunity." *Id.*, at 1246 (opinion dissenting in part and concurring in part). Responding directly to the majority's reasoning, he wrote:

> "It is true that procedures afforded in our system of justice give a defendant a good chance to avoid such results of prejudicial publicity as excessive bail, difficulty or inability of selecting an impartial jury, and the like. These procedures reduce the cost of impropriety by a prosecutor, but I do not find that the courts have recognized their availability as a sufficient reason for conferring immunity." *Ibid.*

We granted Buckley's petition for certiorari, vacated the judgment, and remanded the case for further proceedings in light of our intervening decision in *Burns* v. *Reed*, 500 U. S. 478 (1991). 502 U. S. 801 (1991). On remand, the same panel, again divided, reaffirmed its initial decision, with one modification not relevant here. 952 F. 2d 965 (CA7 1992) *(per curiam)*. The Court of Appeals held that "[n]othing in *Burns* undermine[d]" its initial holding that prosecutors are absolutely immune for "normal preparatory steps"; unlike the activities at issue in *Burns*, "[t]alking with (willing) experts is trial preparation." 952 F. 2d, at 966–967. In similar fashion, the court adhered to its conclusion that Fitzsimmons was entitled to absolute immunity for conducting the press conference. The court recognized that the press conference bore some similarities to the conduct in *Burns* (advising the police as to the propriety of an arrest). It did not take place in court, and it was not part of the prosecutor's

trial preparation. 952 F. 2d, at 967. The difference, according to the court, is that "[a]n arrest causes injury whether or not a prosecution ensues," whereas the only constitutional injury caused by the press conference depends on judicial action. *Ibid.*

Judge Fairchild again dissented. He adhered to his earlier conclusion that Fitzsimmons was entitled to only qualified immunity for the press conference, but he was also persuaded that *Burns* had drawn a line between "'conduct closely related to the judicial process'" and conduct in the role of "'administrator or investigative officer.'" He agreed that trial preparation falls on the absolute immunity side of that line, but felt otherwise about the search for favorable evidence that might link the bootprint to petitioner during "a year long pre-arrest and pre-indictment investigation" aggressively supervised by Fitzsimmons. 952 F. 2d, at 969 (opinion dissenting in part).

We granted certiorari for a second time, limited to issues relating to prosecutorial immunity. 506 U. S. 814 (1992).[3] We now reverse.

## III

The principles applied to determine the scope of immunity for state officials sued under Rev. Stat. § 1979, as amended,

---

[3] Although petitioner also alleged that respondents violated his constitutional rights in presenting the fabricated evidence to the grand jury and his trial jury, see App. 10–11, 14–15, we are not presented with any question regarding those claims. The Court of Appeals agreed with the District Court, see *id.*, at 45–47, and held that those actions were protected by absolute immunity. *Buckley* v. *Fitzsimmons,* 919 F. 2d 1230, 1243 (CA7 1990) ("The selection of evidence to present to the grand jurors, and the manner of questioning witnesses, can no more be the basis of liability than may the equivalent activities before the petit jury"). That decision was made according to traditional principles of absolute immunity under § 1983, however, and did not depend on the original, injury-focused theory of absolute prosecutorial immunity with which we are concerned here; nor was it included within the questions presented in petitioner's petition for certiorari.

42 U. S. C. § 1983, are by now familiar. Section 1983 on its face admits of no defense of official immunity. It subjects to liability "[e]very person" who, acting under color of state law, commits the prohibited acts. In *Tenney* v. *Brandhove,* 341 U. S. 367, 376 (1951), however, we held that Congress did not intend § 1983 to abrogate immunities "well grounded in history and reason." Certain immunities were so well established in 1871, when § 1983 was enacted, that "we presume that Congress would have specifically so provided had it wished to abolish" them. *Pierson* v. *Ray,* 386 U. S. 547, 554–555 (1967). See also *Newport* v. *Fact Concerts, Inc.,* 453 U. S. 247, 258 (1981). Although we have found immunities in § 1983 that do not appear on the face of the statute, "[w]e do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy." *Tower* v. *Glover,* 467 U. S. 914, 922–923 (1984). "[O]ur role is to interpret the intent of Congress in enacting § 1983, not to make a freewheeling policy choice." *Malley* v. *Briggs,* 475 U. S. 335, 342 (1986).

Since *Tenney,* we have recognized two kinds of immunities under § 1983. Most public officials are entitled only to qualified immunity. *Harlow* v. *Fitzgerald,* 457 U. S. 800, 807 (1982); *Butz* v. *Economou,* 438 U. S. 478, 508 (1978). Under this form of immunity, government officials are not subject to damages liability for the performance of their discretionary functions when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald,* 457 U. S., at 818. In most cases, qualified immunity is sufficient to "protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Butz* v. *Economou,* 438 U. S., at 506.

We have recognized, however, that some officials perform "special functions" which, because of their similarity to func-

tions that would have been immune when Congress enacted § 1983, deserve absolute protection from damages liability. *Id.*, at 508. "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns* v. *Reed*, 500 U. S., at 486; *Antoine* v. *Byers & Anderson, Inc.*, 508 U. S. 429, 432, and n. 4 (1993). Even when we can identify a common-law tradition of absolute immunity for a given function, we have considered "whether § 1983's history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions." *Tower* v. *Glover*, 467 U. S., at 920. Not surprisingly, we have been "quite sparing" in recognizing absolute immunity for state actors in this context. *Forrester* v. *White*, 484 U. S. 219, 224 (1988).

In determining whether particular actions of government officials fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity, we have applied a "functional approach," see, *e. g., Burns*, 500 U. S., at 486, which looks to "the nature of the function performed, not the identity of the actor who performed it," *Forrester* v. *White*, 484 U. S., at 229. We have twice applied this approach in determining whether the functions of contemporary prosecutors are entitled to absolute immunity.

In *Imbler* v. *Pachtman*, 424 U. S. 409 (1976), we held that a state prosecutor had absolute immunity for the initiation and pursuit of a criminal prosecution, including presentation of the State's case at trial. Noting that our earlier cases had been "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it," *id.*, at 421, we focused on the functions of the prosecutor that had most often invited common-law tort actions. We concluded that the common-law rule of immunity for prosecutors was "well settled" and that "the same considerations of public policy that underlie the common-law rule likewise countenance absolute immu-

nity under § 1983." *Id.*, at 424. Those considerations[4] supported a rule of absolute immunity for conduct of prosecutors that was "intimately associated with the judicial phase of the criminal process." *Id.*, at 430. In concluding that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983," we did not attempt to describe the line between a prosecutor's acts in preparing for those functions, some of which would be absolutely immune, and his acts of investigation or "administration," which would not. *Id.*, at 431, and n. 33.

We applied the *Imbler* analysis two Terms ago in *Burns* v. *Reed*, 500 U. S. 478 (1991). There the § 1983 suit challenged two acts by a prosecutor: (1) giving legal advice to the police on the propriety of hypnotizing a suspect and on whether probable cause existed to arrest that suspect, and (2) participating in a probable-cause hearing. We held that only the latter was entitled to absolute immunity. Immunity for that action under § 1983 accorded with the common-law absolute immunity of prosecutors and other attorneys for eliciting false or defamatory testimony from witnesses or for making false or defamatory statements during, and related to, judicial proceedings. *Id.*, at 489–490; *id.*, at 501 (SCALIA, J., concurring in judgment in part and dissenting in

---

[4] In particular, we expressed concern that fear of potential liability would undermine a prosecutor's performance of his duties by forcing him to consider his own potential liability when making prosecutorial decisions and by diverting his "energy and attention . . . from the pressing duty of enforcing the criminal law." *Imbler* v. *Pachtman*, 424 U. S., at 424–425. Suits against prosecutors would devolve into "a virtual retrial of the criminal offense of a new forum," *id.*, at 425, and would undermine the vigorous enforcement of the law by providing a prosecutor an incentive not "to go forward with a close case where an acquittal likely would trigger a suit against him for damages," *id.*, at 426, and n. 24. We also expressed concern that the availability of a damages action might cause judges to be reluctant to award relief to convicted defendants in post-trial motions. *Id.*, at 427.

part).   Under that analysis, appearing before a judge and
presenting evidence in support of a motion for a search war-
rant involved the prosecutor's "'role as advocate for the
State.'"   *Id.*, at 491, quoting *Imbler*, 424 U. S., at 431, n. 33.
Because issuance of a search warrant is a judicial act, appear-
ance at the probable-cause hearing was "'intimately associ-
ated with the judicial phase of the criminal process,'" *Burns*,
500 U. S., at 492, quoting *Imbler*, 424 U. S., at 430.

We further decided, however, that prosecutors are not
entitled to absolute immunity for their actions in giving legal
advice to the police.   We were unable to identify any his-
torical or common-law support for absolute immunity in the
performance of this function.   500 U. S., at 492–493.   We
also noted that any threat to the judicial process from "the
harassment and intimidation associated with litigation"
based on advice to the police was insufficient to overcome the
"[a]bsen[ce] [of] a tradition of immunity comparable to the
common-law immunity from malicious prosecution, which
formed the basis for the decision in *Imbler*."   *Id.*, at 493, 494.
And though we noted that several checks other than civil
litigation prevent prosecutorial abuses in advising the police,
"one of the most important checks, the judicial process," will
not be effective in all cases, especially when in the end the
suspect is not prosecuted.   *Id.*, at 496.   In sum, we held
that providing legal advice to the police was not a function
"closely associated with the judicial process."   *Id.*, at 495.

## IV

In this case the Court of Appeals held that respondents
are entitled to absolute immunity because the injuries suf-
fered by petitioner occurred during criminal proceedings.
That holding is contrary to the approach we have consist-
ently followed since *Imbler*.   As we have noted, the *Imbler*
approach focuses on the conduct for which immunity is
claimed, not on the harm that the conduct may have caused
or the question whether it was lawful.   The location of the

injury may be relevant to the question whether a complaint
has adequately alleged a cause of action for damages (a ques-
tion that this case does not present, see *supra*, at 261). It
is irrelevant, however, to the question whether the conduct
of a prosecutor is protected by absolute immunity. Accord-
ingly, although the Court of Appeals' reasoning may be rele-
vant to the proper resolution of issues that are not before us,
it does not provide an acceptable basis for concluding that
either the preindictment fabrication of evidence or the post-
indictment press conference was a function protected by
absolute immunity. We therefore turn to consider each of
respondents' claims of absolute immunity.

A

We first address petitioner's argument that the prosecu-
tors are not entitled to absolute immunity for the claim that
they conspired to manufacture false evidence that would link
his boot with the bootprint the murderer left on the front
door. To obtain this false evidence, petitioner submits, the
prosecutors shopped for experts until they found one who
would provide the opinion they sought. App. 7–9. At the
time of this witness shopping the assistant prosecutors were
working hand in hand with the sheriff's detectives under
the joint supervision of the sheriff and State's attorney
Fitzsimmons.

Petitioner argues that *Imbler's* protection for a prosecu-
tor's conduct "in initiating a prosecution and in presenting
the State's case," 424 U. S., at 431, extends only to the act of
initiation itself and to conduct occurring in the courtroom.
This extreme position is plainly foreclosed by our opinion in
*Imbler* itself. We expressly stated that "the duties of the
prosecutor in his role as advocate for the State involve ac-
tions preliminary to the initiation of a prosecution and ac-
tions apart from the courtroom," and are nonetheless enti-
tled to absolute immunity. *Id.*, at 431, n. 33. We noted in
particular that an out-of-court "effort to control the presen-

tation of [a] witness' testimony" was entitled to absolute immunity because it was "fairly within [the prosecutor's] function as an advocate." *Id.*, at 430, n. 32. To be sure, *Burns* made explicit the point we had reserved in *Imbler*, 424 U. S., at 430–431, and n. 33: A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity. See *Burns*, 500 U. S., at 494–496. We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

On the other hand, as the function test of *Imbler* recognizes, the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor. Qualified immunity " 'represents the norm' " for executive officers, *Malley* v. *Briggs*, 475 U. S., at 340, quoting *Harlow* v. *Fitzgerald*, 457 U. S., at 807, so when a prosecutor "functions as an administrator rather than as an officer of the court" he is entitled only to qualified immunity. *Imbler*, 424 U. S., at 431, n. 33. There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Hampton* v. *Chicago*, 484 F. 2d 602, 608 (CA7 1973)

(internal quotation marks omitted), cert. denied, 415 U. S. 917 (1974). Thus, if a prosecutor plans and executes a raid on a suspected weapons cache, he "has no greater claim to complete immunity than activities of police officers allegedly acting under his direction." 484 F. 2d, at 608–609.

The question, then, is whether the prosecutors have carried their burden of establishing that they were functioning as "advocates" when they were endeavoring to determine whether the bootprint at the scene of the crime had been made by petitioner's foot. A careful examination of the allegations concerning the conduct of the prosecutors during the period before they convened a special grand jury to investigate the crime provides the answer. See *supra*, at 263, n. 1. The prosecutors do not contend that they had probable cause to arrest petitioner or to initiate judicial proceedings during that period. Their mission at that time was entirely investigative in character. A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.[5]

---

[5] Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination, as the opinion dissenting in part points out, *post*, at 290, a prosecutor may engage in "police investigative work" that is entitled to only qualified immunity.

Furthermore, there is no "true anomaly," *post*, at 286, in denying absolute immunity for a state actor's investigative acts made before there is probable cause to have a suspect arrested just because a prosecutor would be entitled to absolute immunity for the malicious prosecution of someone whom he lacked probable cause to indict. That criticism ignores the essence of the function test. The reason that lack of probable cause allows us to deny absolute immunity to a state actor for the former function (fabrication of evidence) is that there is no common-law tradition of immunity for it, whether performed by a police officer or prosecutor. The reason that we grant it for the latter function (malicious prosecution) is that we have found a common-law tradition of immunity for a prosecutor's decision to bring an indictment, whether he has probable cause or not. By insisting on an equation of the two functions merely because a prosecutor

It was well after the alleged fabrication of false evidence concerning the bootprint that a special grand jury was empaneled. And when it finally was convened, its immediate purpose was to conduct a more thorough investigation of the crime—not to return an indictment against a suspect whom there was already probable cause to arrest. Buckley was not arrested, in fact, until 10 months after the grand jury had been convened and had finally indicted him. Under these circumstances, the prosecutors' conduct occurred well before they could properly claim to be acting as advocates. Respondents have not cited any authority that supports an argument that a prosecutor's fabrication of false evidence during the preliminary investigation of an unsolved crime was immune from liability at common law, either in 1871 or at any date before the enactment of § 1983. It therefore remains protected only by qualified immunity.

After *Burns*, it would be anomalous, to say the least, to grant prosecutors only qualified immunity when offering legal advice to police about an unarrested suspect, but then to endow them with absolute immunity when conducting investigative work themselves in order to decide whether a suspect may be arrested.[6] That the prosecutors later called

---

might be subject to liability for one but not the other, the dissent allows its particular policy concerns to erase the function test it purports to respect.

In general, the dissent's distress over the denial of absolute immunity for prosecutors who fabricate evidence regarding unsolved crimes, *post*, at 283–285, like the holding of the Court of Appeals, seems to conflate the question whether a § 1983 plaintiff has stated a cause of action with the question whether the defendant is entitled to absolute immunity for his actions.

[6] Cf. *Burns* v. *Reed*, 500 U. S. 478, 495 (1991): "Indeed, it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice. . . . Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive." If the police, under the guidance of the prosecutors, had solicited the alleg-

a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial.[7]  A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial.  When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same.

### B

We next consider petitioner's claims regarding Fitzsimmons' statements to the press.  Petitioner alleged that, during the prosecutor's public announcement of the indictment, Fitzsimmons made false assertions that numerous pieces of evidence, including the bootprint evidence, tied Buckley to a burglary ring that committed the Nicarico murder.  App. 12. Petitioner also alleged that Fitzsimmons released mug shots of him to the media, "which were prominently and repeatedly displayed on television and in the newspapers." *Ibid.*  Peti-

---

edly "fabricated" testimony, of course, they would not be entitled to anything more than qualified immunity.

[7] See *Imbler* v. *Pachtman,* 424 U. S. 409, 431, n. 33 (1976): "Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.  At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court.  Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them."  Although the respondents rely on the first sentence of this passage to suggest that a prosecutor's actions in "obtaining, reviewing, and evaluating" evidence are always protected by absolute immunity, the sentence that follows qualifies that suggestion. It confirms that some of these actions may fall on the administrative, rather than the judicial, end of the prosecutor's activities, and therefore be entitled only to qualified immunity.

tioner's legal theory is that "[t]hese false and prejudicial statements inflamed the populace of DuPage County against" him, *ibid.;* see also *id.,* at 14, thereby defaming him, resulting in deprivation of his right to a fair trial, and causing the jury to deadlock rather than acquit, *id.,* at 19.

Fitzsimmons' statements to the media are not entitled to absolute immunity. Fitzsimmons does not suggest that in 1871 there existed a common-law immunity for a prosecutor's, or attorney's, out-of-court statement to the press. The Court of Appeals agreed that no such historical precedent exists. 952 F. 2d, at 967. Indeed, while prosecutors, like all attorneys, were entitled to absolute immunity from defamation liability for statements made during the course of judicial proceedings and relevant to them, see *Burns,* 500 U. S., at 489–490; *Imbler,* 424 U. S., at 426, n. 23; *id.,* at 439 (WHITE, J., concurring in judgment), most statements made out of court received only good-faith immunity. The common-law rule was that "[t]he speech of a counsel is privileged by the occasion on which it is spoken . . . ." *Flint* v. *Pike,* 4 Barn. & Cress. 473, 478, 107 Eng. Rep. 1136, 1138 (K. B. 1825) (Bayley, J.).[8]

The functional approach of *Imbler,* which conforms to the common-law theory, leads us to the same conclusion. Comments to the media have no functional tie to the judicial process just because they are made by a prosecutor. At the

___

[8] "[Absolute immunity] does not apply to or include any publication of defamatory matter before the commencement, or after the termination of the judicial proceeding (unless such publication is an act incidental to the proper initiation thereof, or giving legal effect thereto); nor does it apply to or include any publication of defamatory matter to any person other than those to whom, or in any place other than that in which, such publication is required or authorized by law to be made for the proper conduct of the judicial proceedings." Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum. L. Rev. 463, 489 (1909) (footnotes omitted). See, *e. g., Viosca* v. *Landfried,* 140 La. 610, 615, 73 So. 698, 700 (1916); *Youmans* v. *Smith,* 153 N. Y. 214, 220–223, 47 N. E. 265, 267–268 (1897). See also G. Bower, Law of Actionable Defamation 103, n. *h,* 104–105 (1908).

press conference, Fitzsimmons did not act in "'his role as advocate for the State,'" *Burns* v. *Reed,* 500 U. S., at 491, quoting *Imbler* v. *Pachtman,* 424 U. S., at 431, n. 33. The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the State's case in court, or actions preparatory for these functions. Statements to the press may be an integral part of a prosecutor's job, see National District Attorneys Assn., National Prosecution Standards 107, 110 (2d ed. 1991), and they may serve a vital public function. But in these respects a prosecutor is in no different position than other executive officials who deal with the press, and, as noted, *supra,* at 268, 277, qualified immunity is the norm for them.

Fitzsimmons argues nonetheless that policy considerations support extending absolute immunity to press statements. Brief for Respondents 30–33. There are two responses to his submissions. First, "[w]e do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy." *Tower* v. *Glover,* 467 U. S., at 922–923. When, as here, the prosecutorial function is not within the advocate's role and there is no historical tradition of immunity on which we can draw, our inquiry is at an end. Second, "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns* v. *Reed,* 500 U. S., at 486–487. Even if policy considerations allowed us to carve out new absolute immunities to liability for constitutional wrongs under § 1983, we see little reason to suppose that qualified immunity would provide adequate protection to prosecutors in their provision of legal advice to the police, see *id.,* at 494–496, yet would fail to provide sufficient protection in the present context.[9]

---

[9] The Circuits other than the Seventh Circuit that have addressed this issue have applied only qualified immunity to press statements, see, *e. g., Powers* v. *Coe,* 728 F. 2d 97, 103 (CA2 1984); *Marrero* v. *Hialeah,* 625 F. 2d 499, 506–507 (CA5 1980), cert. denied, 450 U. S. 913 (1981); *Gobel* v. *Mari-*

## V

In his complaint, petitioner also charged that the prosecutors violated his rights under the Due Process Clause through extraction of statements implicating him by coercing two witnesses and paying them money. App. 9–11, 19. The precise contours of these claims are unclear, and they were not addressed below; we leave them to be passed on in the first instance by the Court of Appeals on remand.

As we have stated, *supra,* at 261, 264, 265, n. 2, petitioner does not challenge many aspects of the Court of Appeals' decision, and we have not reviewed them; they remain undisturbed by this opinion. As to the two challenged rulings on absolute immunity, however, the judgment of the United States Court of Appeals for the Seventh Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring.

As the Court observes, respondents have not demonstrated that the function either of fabricating evidence during the preliminary investigation of a crime, or of making out-of-court statements to the press, was protected by a well-established common-law privilege in 1871, when § 1983 was enacted. See *ante,* at 275, 277. It follows that respondents' alleged performance of such acts is not absolutely

---

*copa County,* 867 F. 2d 1201, 1205 (CA9 1989); *England* v. *Hendricks,* 880 F. 2d 281, 285 (CA10 1989), cert. denied, 493 U. S. 1078 (1990); *Marx* v. *Gumbinner,* 855 F. 2d 783, 791 (CA11 1988); cf. *Rose* v. *Bartle,* 871 F. 2d 331, 345–346 (CA3 1989), yet Fitzsimmons has not suggested that prosecutors in those Circuits have been unduly constrained in keeping the public informed of pending criminal prosecutions. We also do not perceive why anything except a firm common-law rule should entitle a prosecutor to absolute immunity for his statements to the press when nonprosecutors who make similar statements, for instance, an attorney general's press spokesperson or a police officer announcing the return of an indictment, receive only qualified immunity.

immune from suit under § 1983, since "the presumed legislative intent not to eliminate traditional immunities is our only justification for limiting the categorical language of the statute." *Burns* v. *Reed,* 500 U. S. 478, 498 (1991) (SCALIA, J., concurring in judgment in part and dissenting in part); accord, *ante,* at 267–269. The policy reasons for extending protection to such conduct may seem persuasive, see *post,* at 283–286 (KENNEDY, J., concurring in part and dissenting in part), but we simply "do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy," *Tower* v. *Glover,* 467 U. S. 914, 922–923 (1984). This is therefore an easy case, in my view, and I have no difficulty joining the Court's judgment.

I join the Court's opinion as well, though I have some reservation about the historical authenticity of the "principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity," *ante,* at 273. By the early years of this century, there was some authority for the proposition that the traditional defamation immunity extends to "act[s] incidental to the proper initiation" or pursuit of a judicial proceeding, such as "[s]tatements made by counsel to proposed witnesses," Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum. L. Rev. 463, 489, and n. 82 (1909). See, *e. g.,* G. Bower, Actionable Defamation 103–105, and n. *h* (1908); *Youmans* v. *Smith,* 153 N. Y. 214, 47 N. E. 265 (1897). I have not found any previous expression of such a principle, but accede to the Court's judgment that it existed several decades earlier, when § 1983 was enacted, at least in the sense that it could be logically derived from then-existing decisions, cf. *Burns, supra,* at 505 (SCALIA, J., concurring in judgment in part and dissenting in part). In future cases, I trust the Court (aided by briefing on the point) will look to history to determine more precisely the outlines of this principle. It is certainly

in accord with the principle to say that prosecutors cannot "properly claim to be acting as advocates" *before* they have "probable cause to have anyone arrested," *ante,* at 274, 275—but reference to the common-law cases will be indispensable to show when they can properly claim to be acting "as advocates" *after* that point, though not yet "during the course of judicial proceedings," *ante,* at 277.

I believe, moreover, that the vagueness of the "acting-as-advocate" principle may be less troublesome in practice than it seems in theory, for two reasons. First, the Court reaffirms that the defendant official bears the burden of showing that the conduct for which he seeks immunity would have been privileged at common law in 1871. See *ante,* at 269, 275, 277–278. Thus, if application of the principle is unclear, the defendant simply loses. Second, many claims directed at prosecutors, of the sort that are based on acts not plainly covered by the conventional malicious-prosecution and defamation privileges, are probably not actionable under § 1983, and so may be dismissed at the pleading stage without regard to immunity—undermining the dissent's assertion that we have converted absolute prosecutorial immunity into "little more than a pleading rule," *post,* at 283. I think petitioner's false-evidence claims in the present case illustrate this point. Insofar as they are based on respondents' supposed knowing *use* of fabricated evidence before the grand jury and at trial, see *ante,* at 267, n. 3—acts which might state a claim for denial of due process, see, *e. g., Mooney* v. *Holohan,* 294 U. S. 103, 112 (1935) *(per curiam)*—the traditional defamation immunity provides complete protection from suit under § 1983. If "reframe[d] . . . to attack the preparation" of that evidence, *post,* at 283, the claims are unlikely to be cognizable under § 1983, since petitioner cites, and I am aware of, no authority for the proposition that the mere preparation of false evidence, as opposed to its use in a fashion that deprives someone of a fair trial or otherwise harms him, violates the Constitution. See *Buckley* v. *Fitzsimmons,* 919

F. 2d 1230, 1244 (CA7 1990), vacated and remanded, 502 U. S. 801 (1991).

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE SOUTER join, concurring in part and dissenting in part.

I agree there is no absolute immunity for statements made during a press conference. But I am unable to agree with the Court's conclusion that respondents are not entitled to absolute immunity on petitioner's claim that they conspired to manufacture false evidence linking petitioner to the boot-print found on the front door of Jeanine Nicarico's home. I join Parts I, II, III, and IV–B of the Court's opinion, but dissent from Part IV–A.

I

As the Court is correct to observe, the rules determining whether particular actions of government officials are entitled to immunity have their origin in historical practice and have resulted in a functional approach. *Ante*, at 267–268. See also *Burns* v. *Reed*, 500 U. S. 478, 484–486 (1991); *Forrester* v. *White*, 484 U. S. 219, 224 (1988); *Malley* v. *Briggs*, 475 U. S. 335, 342–343 (1986); *Cleavinger* v. *Saxner*, 474 U. S. 193, 201 (1985); *Briscoe* v. *LaHue*, 460 U. S. 325, 342 (1983); *Harlow* v. *Fitzgerald*, 457 U. S. 800, 810 (1982); *Butz* v. *Economou*, 438 U. S. 478, 511–513 (1978); *Imbler* v. *Pachtman*, 424 U. S. 409, 420–425 (1976). I share the Court's unwillingness to accept Buckley's argument "that *Imbler*'s protection for a prosecutor's conduct 'in initiating a prosecution and in presenting the State's case,' 424 U. S., at 431, extends only to the act of initiation itself and to conduct occurring in the courtroom." *Ante*, at 272. In *Imbler*, we acknowledged that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom," and we explained that these actions of the prosecutor, undertaken in

his functional role as an advocate, were entitled to absolute immunity, 424 U. S., at 431, n. 33.   See *ante,* at 269–270.

There is a reason even more fundamental than that stated by the Court for rejecting Buckley's argument that *Imbler* applies only to the commencement of a prosecution and to in-court conduct.   This formulation of absolute prosecutorial immunity would convert what is now a substantial degree of protection for prosecutors into little more than a pleading rule.   Almost all decisions to initiate prosecution are preceded by substantial and necessary out-of-court conduct by the prosecutor in evaluating the evidence and preparing for its introduction, just as almost every action taken in the courtroom requires some measure of out-of-court preparation.   Were preparatory actions unprotected by absolute immunity, a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves.   *Imbler* v. *Pachtman, supra,* at 431, n. 34.   Cf. *Eastland* v. *United States Servicemen's Fund,* 421 U. S. 491, 503–507 (1975).   Allowing the avoidance of absolute immunity through that pleading mechanism would undermine in large part the protections that we found necessary in *Imbler* and would discourage trial preparation by prosecutors.   In this way, Buckley's proffered standard would have the perverse effect of encouraging, rather than penalizing, carelessness, cf. *Forrester* v. *White, supra,* at 223, and it would discourage early participation by prosecutors in the criminal justice process.

Applying these principles to the case before us, I believe that the conduct relating to the expert witnesses falls on the absolute immunity side of the divide.   As we recognized in *Imbler* and *Burns,* and do recognize again today, the functional approach does not dictate that all actions of a prosecutor are accorded absolute immunity.   "When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the

one and not the other.'" *Ante*, at 273, quoting *Hampton* v. *Chicago*, 484 F. 2d 602, 608 (CA7 1973), cert. denied, 415 U. S. 917 (1974). Nonetheless, while Buckley labels the prosecutors' actions relating to the bootprint experts as "investigative," I believe it is more accurate to describe the prosecutors' conduct as preparation for trial. A prosecutor must consult with a potential trial witness before he places the witness on the stand, and if the witness is a critical one, consultation may be necessary even before the decision whether to indict. It was obvious from the outset that the bootprint was critical to the prosecution's case, and the prosecutors' consultation with experts is best viewed as a step to ensure the bootprint's admission in evidence and to bolster its probative value in the eyes of the jury.

Just as *Imbler* requires that the decision to use a witness must be insulated from liability, 424 U. S., at 426, it requires as well that the steps leading to that decision must be free of the distortive effects of potential liability, at least to the extent that the prosecutor is engaged in trial preparation. Actions in "obtaining, reviewing, and evaluating" witness testimony, *id.*, at 431, n. 33, are a classic function of the prosecutor as advocate. Pretrial and even preindictment consultation can be "intimately associated with the judicial phase of the criminal process," *id.*, at 430. Potential liability premised on the prosecutor's early consultation would have "an adverse effect upon the functioning of the criminal justice system," *id.*, at 426. Concern about potential liability arising from pretrial consultation with a witness might "hampe[r]" a prosecutor's exercise of his judgment as to whether a certain witness should be used. *Id.*, at 426, and n. 24. The prospect of liability may "induc[e] [a prosecutor] to act with an excess of caution or otherwise to skew [his] decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide [his] conduct." *Forrester* v. *White, supra*, at 223. Moreover, "[e]xposing the prosecutor to liability for the initial phase of

his prosecutorial work could interfere with his exercise of independent judgment at every phase of his work, since the prosecutor might come to see later decisions in terms of their effect on his potential liability." *Malley* v. *Briggs,* 475 U. S., at 343. That distortion would frustrate the objective of accuracy in the determination of guilt or innocence. See *Imbler* v. *Pachtman, supra,* at 426.

Furthermore, the very matter the prosecutors were considering, the decision to use particular expert testimony, was "subjected to the 'crucible of the judicial process.'" *Burns* v. *Reed,* 500 U. S., at 496, quoting *Imbler* v. *Pachtman, supra,* at 440 (WHITE, J., concurring in judgment). Indeed, it appears that the only constitutional violations these actions are alleged to have caused occurred within the judicial process. The question Buckley presented in his petition for certiorari itself makes this point: "Whether prosecutors are entitled to absolute prosecutorial immunity for supervision of and participation in a year long pre-arrest and pre-indictment investigation because the injury suffered by the criminal defendant occurred during the later criminal proceedings?" Pet. for Cert. i. Remedies other than prosecutorial liability, for example, a pretrial ruling of inadmissibility or a rejection by the trier of fact, are more than adequate "to prevent abuses of authority by prosecutors." *Burns* v. *Reed, supra,* at 496. See also *Butz* v. *Economou,* 438 U. S., at 512; *Imbler* v. *Pachtman, supra,* at 429.

Our holding in *Burns* v. *Reed, supra,* is not to the contrary. There we cautioned that prosecutors were not entitled to absolute immunity for "every litigation-inducing conduct," *id.,* at 494, or for every action that "could be said to be in some way related to the ultimate decision whether to prosecute," *id.,* at 495. The premise of *Burns* was that, in providing advice to the police, the prosecutor acted to guide the police, not to prepare his own case. See *id.,* at 482 (noting that the police officers sought the prosecutor's advice first to find out whether hypnosis was "an unacceptable investiga-

tive technique" and later to determine whether there was a basis to "plac[e] [a suspect] under arrest"). In those circumstances, we found an insufficient link to the judicial process to warrant absolute immunity. But the situation here is quite different. For the reasons already explained, subjecting a prosecutor's pretrial or preindictment witness consultation and preparation to damages actions would frustrate and impede the judicial process, the result *Imbler* is designed to avoid.

## II

The Court reaches a contrary conclusion on the issue of the bootprint evidence by superimposing a bright-line standard onto the functional approach that has guided our past decisions. According to the Court, "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Ante,* at 274. To allow otherwise, the Court tells us, would create an anomalous situation whereby prosecutors are granted only qualified immunity when offering legal advice to the police regarding an unarrested suspect, see *Burns, supra,* at 492–496, but are endowed with absolute immunity when conducting their own legal work regarding an unarrested suspect. *Ante,* at 275–276.

I suggest that it is the Court's probable-cause demarcation between when conduct can be considered absolutely immune advocacy and when it cannot that creates the true anomaly in this case. We were quite clear in *Imbler* that if absolute immunity for prosecutors meant anything, it meant that prosecutors were not subject to suit for malicious prosecution. 424 U. S., at 421–422, 424, 428. See also *Burns, supra,* at 493 ("[T]he common-law immunity from malicious prosecution . . . formed the basis for the decision in *Imbler*"). Yet the central component of a malicious prosecution claim is that the prosecutor in question acted maliciously and *without probable cause.* See *Wyatt* v. *Cole,* 504 U. S. 158, 165 (1992); *id.,* at 170 (KENNEDY, J., concurring); *id.,* at 177

(REHNQUIST, C. J., dissenting); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 119 (5th ed. 1984). If the Court means to withhold absolute immunity whenever it is alleged that the injurious actions of a prosecutor occurred before he had probable cause to believe a specified individual committed a crime, then no longer is a claim for malicious prosecution subject to ready dismissal on absolute immunity grounds, at least where the claimant is clever enough to include some actions taken by the prosecutor prior to the initiation of prosecution. I find it rather strange that the classic case for the invocation of absolute immunity falls on the unprotected side of the Court's new dividing line. I also find it hard to accept any line that can be so easily manipulated by criminal defendants turned civil plaintiffs, allowing them to avoid a dismissal on absolute immunity grounds by throwing in an allegation that a prosecutor acted without probable cause. See *supra,* at 283.

Perhaps the Court means to draw its line at the point where an appropriate neutral third party, in this case the Illinois special grand jury, makes a determination of probable cause. This line, too, would generate anomalous results. To begin, it could have the perverse effect of encouraging prosecutors to seek indictments as early as possible in an attempt to shelter themselves from liability, even in cases where they would otherwise prefer to wait on seeking an indictment to ensure that they do not accuse an innocent person. Given the stigma and emotional trauma attendant to an indictment and arrest, promoting premature indictments and arrests is not a laudable accomplishment.

Even assuming these premature actions would not be induced by the Court's rule, separating absolute immunity from qualified immunity based on a third-party determination of probable cause makes little sense when a civil plaintiff claims that a prosecutor falsified evidence or coerced confessions. If the false evidence or coerced confession served as the basis for the third party's determination of probable

cause, as was alleged here, it is difficult to fathom why securing such a fraudulent determination transmogrifies unprotected conduct into protected conduct. Finally, the Court does not question our conclusion in *Burns* that absolute immunity attached to a prosecutor's conduct before a grand jury because it "'perform[s] a judicial function.'" 500 U. S., at 490, quoting W. Prosser, Law of Torts § 94, pp. 826–827 (1941). See also *Yaselli* v. *Goff*, 12 F. 2d 396 (CA2 1926), aff'd, 275 U. S. 503 (1927). It is unclear to me, then, why preparing for grand jury proceedings, which obviously occur before an indictment is handed down, cannot be "intimately associated with the judicial phase of the criminal process" and subject to absolute immunity. *Burns, supra,* at 492, quoting *Imbler, supra,* at 430.

As troubling as is the line drawn by the Court, I find the reasons for its line-drawing to be of equal concern. The Court advances two reasons for distinguishing between preprobable-cause and post-probable-cause activity by prosecutors. First, the distinction is needed to ensure that prosecutors receive no greater protection than do police officers when engaged in identical conduct. *Ante,* at 276. Second, absent some clear distinction between investigation and advocacy, the Court fears, "every prosecutor might . . . shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial." *Ibid.* This step, it is alleged, would enable any prosecutor to "retrospectively describ[e]" his investigative work "as 'preparation' for a possible trial" and therefore request the benefits of absolute immunity. *Ibid.* I find neither of these justifications persuasive.

The Court's first concern, I take it, is meant to be a restatement of one of the unquestioned goals of our § 1983 immunity jurisprudence: ensuring parity in treatment among state actors engaged in identical functions. *Forrester* v. *White,* 484 U. S., at 229; *Cleavinger* v. *Saxner,* 474 U. S., at

201.   But it was for the precise reason of advancing this goal that we adopted the functional approach to absolute immunity in the first place, and I do not see a need to augment that approach by developing bright-line rules in cases where determining whether different actors are engaged in identical functions involves careful attention to subtle details. The Court, moreover, perceives a danger of disparate treatment because it assumes that before establishing probable cause, police and prosecutors perform the same functions. *Ante*, at 276.   This assumption seem to me unwarranted.   I do not understand the art of advocacy to have an inherent temporal limitation, so I cannot say that prosecutors are never functioning as advocates before the determination of probable cause.   More to the point, the Court's assumption further presumes that when both prosecutors and police officers engage in the same conduct, they are of necessity engaged in the same function.   With this I must disagree. Two actors can take part in similar conduct and similar inquiries while doing so for different reasons and to advance different functions.   It may be that a prosecutor and a police officer are examining the same evidence at the same time, but the prosecutor is examining the evidence to determine whether it will be persuasive at trial and of assistance to the trier of fact, while the police officer examines the evidence to decide whether it provides a basis for arresting a suspect. The conduct is the same but the functions distinct.   See Buchanan, Police-Prosecutor Teams, 23 The Prosecutor 32 (summer 1989).

Advancing to the second reason provided for the Court's line-drawing, I think the Court overstates the danger of allowing pre-probable-cause conduct to constitute advocacy entitled to absolute immunity.   I agree with the Court that the institution of a prosecution "does not retroactively transform . . . work from the administrative into the prosecutorial," *ante*, at 276, but declining to institute a prosecution

likewise should not "retroactively transform" work from the prosecutorial into the administrative. Cf. *Imbler*, 424 U. S., at 431, n. 33 ("We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution . . . . These include questions of whether to present a case to a grand jury, whether to file an information, [and] whether and when to prosecute"). In either case, the primary question, one which I have confidence the federal courts are able to answer with some accuracy, is whether a prosecutor was acting as an advocate, an investigator, or an administrator when he took the actions called into question in a subsequent § 1983 action. As long as federal courts center their attention on this question, a concern that prosecutors can disguise their investigative and administrative actions as early forms of advocacy seems to be unfounded.

## III

In recognizing a distinction between advocacy and investigation, the functional approach requires the drawing of difficult and subtle distinctions, and I understand the necessity for a workable standard in this area. But the rule the Court adopts has created more problems than it has solved. For example, even after there is probable cause to arrest a suspect or after a suspect is indicted, a prosecutor might act to further police investigative work, say by finding new leads, in which case only qualified immunity should apply. The converse is also true: Even before investigators are satisfied that probable cause exists or before an indictment is secured, a prosecutor might begin preparations to present testimony before a grand jury or at trial, to which absolute immunity must apply. In this case, respondents functioned as advocates, preparing for prosecution before investigators are alleged to have amassed probable cause and before an indictment was deemed appropriate. In my judgment

respondents are entitled to absolute immunity for their involvement with the expert witnesses in this case. With respect, I dissent from that part of the Court's decision reversing the Court of Appeals judgment of absolute immunity for respondents' conduct in relation to the bootprint evidence.